UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | **CRIMINAL NO. 16-CR-0183-04** |
| **VERSUS** | * | **JUDGE FOOTE** |
| **BARRY DRUILHET, JR.** | * | **MAG. JUDGE WHITEHURST** |

### REPORT AND RECOMMENDATION

Before the Court are: a Motion to Suppress Evidence (Doc. 113), filed by Defendant Barry Druilhet, Jr.; the government's Opposition (Doc. 119); and Defendant's Reply (Doc. 125). An evidentiary hearing was held on March 16, 2017. Testifying at the hearing were Detectives Christopher Crappell and Daniel Weidenboerner of the St. Mary Parish Sheriff's Office.[1] Considering the evidence, the law, and the arguments of the parties, and for the reasons fully explained below, it is recommended that the Motion to Suppress be **DENIED**.

---

[1] Defendant initially intended to call Detective John Kahl to testify at the suppression hearing. However, Detective Kahl was unable to attend the hearing due to sickness, and the Court indicated that the record would be held open until Detective Kahl was able to testify. (Doc. 130, Suppression Hearing Transcript ("SHT") at p 4-5.) At the conclusion of the hearing, however, counsel for Defendant agreed that Detective Kahl's testimony was unnecessary. (Doc. 130, SHT at p. 52.)

## *I. Background*

In April 2015, Detective Crappell prepared and submitted identical affidavits for two search warrants (Warrant Nos. 2015-3568 and 15-038) to the 16th Judicial District Court of the St. Mary Parish. (*See* Docs. 129-1 and 129-2) The search warrants were issued for Defendant's residence located at 505 Railroad Avenue and a nearby structure, commonly referred to as a "stash house," located at 213 Orphan Home Road. (Docs. 129-1 and 129-2 at p. 1.) The structures were in Baldwin, Louisiana, around the corner from one another. (Doc. 130, SHT at p. 25-26.)

The affidavits in support of the search warrants begin with several paragraphs outlining historical information provided to the St. Mary Parish Sheriff's Office by RCIs from 1999. (Doc. 130, SHT at p. 16; Docs. 129-1 and 129-2 at pp. 5-6.) The information covers Defendant's narcotics trafficking during that year. The affidavits proceed to outline additional historical information, gleaned from the police's investigative files, with regard to Defendant's illegal narcotics activity in the years 2012-2013. (Doc. 130, SHT at p. 17-18; Docs 129-1 and 129-2 at pp. 6-7.) The information disclosed describes several instances where agents and detectives from the St. Mary Parish Sheriff's Office either conducted undercover operations or received tips from concerned citizens or reliable confidential informants ("RCIs") regarding Defendant's drug activities. (Docs. 129-1 and 129-2 at pp. 6-7.) Detective

Crappell testified that the historical information provided in the affidavits was not used to establish probable cause for searching either residence. (Doc. 130, SHT at p. 12.)

The affidavits proceed to disclose information, beginning on September 23, 2014, which directly relates to the pending federal charges brought against Defendant. These paragraphs, which reference information provided by one particular RCI (Doc. 130, SHT at pp. 19, 22, 24, 26, 28-29), describe in pertinent part as follows:

> 1. On September 23, 2014, the RCI provided information to Detective Weidenboerner that Defendant was selling cocaine from his residence at 505 Railroad Avenue. The RCI met Detectives Weidenboerner and Crappell at a predetermined location free of contraband and proceeded to make an audio monitored purchase of cocaine with marked money. Detective Dustin Kennedy watched the RCI enter the residence and after exiting, the RCI met with the detectives and turned over the cocaine.
>
> 2. On October 22, 2014, the RCI contacted Detective Weidenboerner and informed the detective that he knew about narcotics sales from both 505 Railroad Avenue and 213 Orphan Home Road. Upon meeting with detectives, the RCI was searched and found free and clear of contraband. The RCI was then equipped with an audio transmitter and marked money. The RCI went to 505 Railroad Avenue and made contact with a male named William Pierre. Pierre used a hand-held radio to report to someone that everything was "Code-4." Soon after, Defendant's son, Brontre Druilhet, appeared at the location and served the RCI

crack cocaine in exchange for marked money. The RCI met back at a predetermined location and turned over the crack cocaine.

3. On December 2, 2014, Detective Weidenboerner was again contacted by the RCI who reported that Brontre Druilhet was selling crack cocaine on the corner of Railroad Avenue and Orphan Home Road. The RCI met Detective Weidenboerner and other detectives and, after being searched for contraband, he proceeded to make an audio transmitted controlled purchase of crack cocaine with marked money at 505 Railroad Avenue. Brontre Druilhet was observed by Lieutenant Duval Arthur of the St. Mary Parish Sheriff's Office, exiting 213 Orphan Home Road and walking to 505 Railroad Avenue to make the sale. The RCI met back at a predetermined location and turned over the crack cocaine.

4. On March 14, 2015, detectives with the St. Mary Parish Sheriff's Office Narcotics Division received information from a concerned citizen that Defendant was keeping illegal narcotics at 213 Orphan Home Road. The concerned citizen further stated that he had observed Defendant, who also went by the name "Bird", enter and exit 213 Orphan Home Road shortly before waiting "on a vehicle to conduct a hand to hand."

5. On March 17, 2015, the RCI contacted Detective Crappell to inform the detective that he had observed a male purchase a large amount of cocaine from Defendant at 505 Railroad Avenue. During this transaction, the RCI observed Defendant walking over to 213 Orphan Home Road to retrieve cocaine for the purchaser since there was only a small amount of cocaine at 505 Railroad Avenue at that time.

6. On March 29, 2015, the RCI contacted Detective Crappell to inform the detective that he had observed Defendant to be in possession of a "stack" of around 20 cocaine cookies at the 505 Railroad Avenue residence. The RCI communicated his observation of a large amount of money in a safe in Defendant's

      bedroom. The RCI further informed Detective Crappell that Defendant was selling pills and marijuana from the residence and that, while some illegal narcotics were at the residence, the majority of Defendant's drugs were stashed at 213 Orphan Home Road.

7. On March 30, 2015, Detective Crappell spoke with Detective Edward Gay from the FBI Taskforce and learned that Defendant had "washed a total of $20,950.00 dollars cash" at a casino between February 11 and February 23, 2015.

8. On April 2, 2015, the St. Mary Parish Sheriff's Office conducted another controlled purchase of crack cocaine from Defendant. The buy was audio transmitted, and Detective Crappell again searched the RCI before conducting the controlled purchase. Before the transaction, the RCI contacted Defendant using his cell phone, and detectives listened to a voice they knew to belong to Defendant from past encounters. Defendant stated that it was okay for the RCI to come to his house to purchase crack cocaine. Detectives watched the RCI park in Defendant's driveway and then overheard the RCI make contact with Defendant and enter the residence where they negotiated the purchase of the crack cocaine. The RCI traveled to a predetermined location and turned the crack cocaine over to Detective Crappell. Later that day, the RCI met with Detective Crappell to identify on a Google map that the "stash" house was located at 213 Orphan Home Road.

(Doc. 129-1 at pp. 7-9; Doc. 129-2 at pp. 7-9.)

On April 10, 2015, the St. Mary Parish Sheriff's Office executed both search warrants. (Docs. 129-1 and Doc. 129-2 at p.11.) The detectives found items at the 505 Railroad Avenue address including marijuana, pills, cell phones, currency, firearms, fentanyl patches, crack cocaine, and clear plastic baggies with white

powder.  (Doc. 129-1 at p. 11.)  At the 213 Orphan Home Road address, the detectives found items including cocaine, a cocaine cookie, a gas mask, measuring cups, and cell phones.  (Doc. 129-2 at p. 11.)

On July 13, 2016, a federal grand jury returned an indictment charging seven defendants with conspiracy to distribute cocaine and unlawful use of a communication facility.  (Doc. 1).  Specifically, the grand jury charged Defendant in Count 1 with Conspiracy to Distribute and Possess with the Intent to Distribute Cocaine and in Count 7 with Unlawful Use of a Communication Facility.  (Doc. 1 at 1-3, 6.)

## II.  Contentions of the Parties

Defendant moves to suppress all evidence obtained as a result of the execution of the search warrants on the basis that such evidence was obtained in violation of Defendant's Fourth Amendment rights.  (Doc. 113.)  Defendant specifically challenges the affidavits submitted in support of the search warrants as being devoid of any information describing the credibility and reliability of the various RCIs mentioned throughout each affidavit.  (Doc. 113-1 at p. 3.)  Defendant contends, therefore, that these affidavits are "bare bones" affidavits which fail to provide any information that the RCIs and other anonymous informants were credible in supplying any tips leading to previous arrests or convictions.  (Doc. 125 at pp. 2-6.)

The government responds that the St. Mary Parish Sheriff's detectives acted in good faith with regard to executing the search warrants because: (1) the affidavits associated with the search warrants are "filled with specific facts about the [D]efendant's narcotics distribution in and around both locations;" and (2) the affidavits describe specific examples of Defendant engaging in transactions from both locations. (Doc. 119 at p. 8.) The government further contends the affidavits contain information as to the credibility and reliability of the RCI by describing various controlled narcotics purchases involving Defendant in which the RCI participated along with various officers and detectives. (Doc. 119 at p. 10.)

The government asserts, therefore, that the search warrants of the two residences were "not so lacking in probable cause that an agent would appear entirely unreasonable and acting in bad faith for relying upon [them] as the basis for a search." (Doc. 119 at p. 8.) The government also asserts that probable cause existed to support the issuance of the search warrants. (Doc. 119 at pp. 8-9.)

### III. Discussion

The Fourth Amendment, which governs all searches and seizures conducted by government agents, provides:

> T]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause,

> supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. Amend. IV. The general purpose of the Fourth Amendment "is to safeguard the privacy and security of individuals against arbitrary invasions by government officials." *United States v. Garza*, 921 F.2d 59, 60 (5ᵗʰ Cir.1991) (citing *Camara v. Municipal Court of the City and County of San Francisco*, 387 U.S. 523, 528 (1967)).

Generally, on a motion to suppress, the defendant has the burden of proving, by a preponderance of the evidence, that the evidence in question was obtained in violation of his constitutional rights. *United States v. Guerrero-Barajas*, 240 F.3d 428, 432 (5th Cir. 2001). "In considering a challenge to a search executed pursuant to a warrant, the first question this Court must ask is not whether probable cause existed for the search[.]" *United States v. Effrom*, No. 08-71, 2008 WL 2510127, at *1 (E.D. La. Jun. 19, 2008). Rather, the court must first determine whether the *Leon* good faith exception to the exclusionary rule² applies. *United States v. Leon*, 468 U.S. 897, 922 (1984); *United States v. Tran*, No. 15-170, 2016 WL 1183129, at *2 (M.D. La. Mar. 28, 2016). "The *Leon* good faith exception provides that evidence is

---

² In general terms, the exclusionary rule prohibits the introduction of evidence at trial that is derivative of an unconstitutional search or seizure and thereby deters police misconduct. *United States v. Gibbs*, 421 F.3d 352, 357 (5ᵗʰ Cir. 2005).

admissible when it is obtained by law enforcement officials acting in objectively reasonable good faith reliance upon a search warrant, even if the affidavit on which the warrant was based was insufficient to establish probable cause." *Tran*, 2016 WL 1183129 at *2 (citing *Leon*, 468 U.S. at 922-23 and *United States v. Craig*, 861 F.2d 818, 821 (5th Cir. 1988)).

Should the court determine that the good faith exception is inapplicable, it may then consider whether the warrant was supported by probable cause. *Tran*, 2016 WL 1183129 at *2 (citing *United States v. Froman*, 355 F.3d 882, 888 (5th Cir. 2004)). "If the good faith exception applies, [the] court need not reach the probable cause issue." *United States v. Foy*, 28 F.3d 464, 473 (5th Cir. 1994).

The issuance of a warrant by a magistrate "normally suffices to establish good faith on the part of law enforcement officers who conduct a search pursuant to a warrant." *Leon*, 468 U.S. at 914, 922. The Fifth Circuit Court of Appeals instructs that:

> [A] reviewing court will defer to a judge's probable cause determination in signing a warrant, and therefore uphold an officer's good faith reliance on that warrant, unless: (1) the issuing-judge "was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth"; (2) the issuing-judge "wholly abandoned his judicial role" in such a manner that "no reasonably well trained officer should rely on the warrant"; (3) the underlying affidavit is "bare bones" ("so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable");

or (4) the warrant is "so facially deficient . . . that the executing officers cannot reasonably presume it to be valid."

*Gibbs*, 421 F.3d at 358 (quoting *Leon*, 468 U.S. at 923).

The parties agree that the third circumstance described in *Gibbs* governs the analysis of this case. (Doc. 119 at p. 7; Doc. 125 at p. 1.) With regard to this circumstance, "'bare bones' affidavits are ones that 'contain wholly conclusory statements, which lack the facts and circumstances from which a magistrate can independently determine probable cause." *Tran*, 2016 WL 1183129 at *2 (quoting *United States v. Satterwhite*, 980 F.2d 317, 320-21 (5th Cir. 1992) and *Illinois v. Gates*, 462 U.S. 213, 239 (1983)). A determination as to whether an affidavit is a "bare bones" one depends on the totality of the circumstances. *United States v. Fisher*, 22 F.3d 574, 578 (5th Cir. 1994). "Such a determination examines the veracity, reliability, and basis of knowledge of a confidential informant, and the information within the affiant's personal knowledge." *Tran*, 2016 WL 1183129 at *2 (citing *Satterwhite*, 980 F.2d at 320-21).

Courts have determined an affidavit to be "bare bones" when it states in a conclusory fashion either that the affiant received reliable information or that the affiant believes contraband will be found in a certain location, without further explanation or corroboration. *See Aguilar v. Texas*, 378 U.S. 108, 109 (1964),

*abrogated on other grounds by Gates*, 462 U.S. 213 (1983) (holding that an affidavit was "bare bones" when it stated that the affiants "have received reliable information from a credible person and do believe" that heroin was stored in a home); *Nathanson v. United States*, 290 U.S. 41, 44 (1933) (holding that an affidavit was "bare bones" when it stated that the affiant "has cause to suspect and does believe" that liquor illegally imported is located on certain premises); *United States v. Barrington*, 806 F.2d 529, 531–32 (5th Cir. 1986) (holding that an affidavit was "bare bones" when it merely stated that the police officer "received information from a confidential informant" who is "known to [to the officer] and has provided information in the past that has led to arrest and convictions").

On the other hand, courts have consistently held that an affidavit is not considered to be "bare bones" if it describes the facts and circumstances by which the affiant corroborated a confidential informant's tip. *Satterwhite*, 980 F.2d at 320–21 (holding that an affidavit was not "bare bones" when the affiant stated that the C.I. had personally accompanied a third person to an apartment for the purpose of buying drugs, and the C.I. observed the third person enter the apartment and return carrying drugs); *Gates*, 462 U.S. at 242 (concluding that "[a]n officer 'may rely upon information received through an informant, rather than upon his direct observations, so long as the informant's statement is reasonably corroborated by other matters

within the officer's knowledge.'"); *Foy*, 28 F.3d 464, 473-74 (5th Cir. 1994) (holding that an affidavit was not "bare bones" when it described a single controlled buy, conducted by a C.I. and supervised by the affiant officer); *Tran*, 2016 WL 1183129, at *3 (holding that an affidavit is not "bare bones" when it describes facts known to officers that corroborate the CI's story which, in turn, is "sufficient to establish the CI's veracity, reliability, and basis of knowledge").

In this case, while the affidavits set forth historical information on Defendant's narcotics activities going back to 1999, the crucial portions of Detective Crappell's affidavits begin with the description of several controlled purchases beginning on September 23, 2014, involving the RCI's participation with Defendant and the two residences. Detective Crappell testified that the RCI referenced in the affidavits from September 23, 2014 onward was the same individual. (Doc. 130, SHT at pp. 19, 22, 24, 26, 28-29.) According to Detectives Crappell and Weidenboerner, the RCI has worked with the police for a long time and has proven to be reliable in past cases resulting in arrests and/or convictions. (Doc. 130, SHT at pp. 19-20, 48-49.)

A review of the affidavits reflects no express indication that the RCI had provided reliable information to the police in the past. (Doc. 130, SHT at pp. 10-11, 45.) Nevertheless, the affidavits depict, in great detail, efforts by the RCI in participating in several controlled purchases at or around Defendant's 505 Railroad

Avenue residence and 213 Orphan Home Road. It is undisputed that information supplied by the RCI regarding Defendant's narcotics activities were independently corroborated by officers and detectives participating in surveillance on the controlled purchases occurring on September 23, 2014, October 22, 2015, December 2, 2014, and April 2, 2015. (Doc. 130, SHT at pp. 28-30, 48-49.) Thus, the specific tips, information, and activities of the RCI in making controlled narcotics purchases from Defendant proved to be reliable with respect to the investigation of Defendant and the narcotics activity occurring at both 505 Railroad Avenue and the "stash" house located at 213 Orphan Home Road.

Based upon Detectives Crappell's personal knowledge gleaned from the surveillance and investigation of Defendant's narcotics activities at the two residences, the independent corroboration of the RCI's tips and information was sufficient to establish the RCI's veracity, reliability, and basis of knowledge. *See Tran*, 2016 WL 1183129, at *3. The officer's reliance on the search warrants, as supported by the extensive and specific facts contained in the affidavits, was therefore objectively reasonable. Pursuant to the good faith exception articulated in *Leon*, Defendant cannot demonstrate a Fourth Amendment violation, and the evidence seized by the officers at 505 Railroad Avenue and 213 Orphan Home Road is admissible. Because the *Leon* good faith exception applies, it is unnecessary to

address whether the search warrants were supported probable cause. *See Foy*, 28 F.3d at 473.

### IV. Conclusion

For the reasons set forth above, it is **RECOMMENDED** that the Motion to Suppress (Doc. 113), filed by Defendant Barry Druilhet, Jr., be **DENIED**.

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Fed. R. Cr. P. 59(b)(2), parties aggrieved by this recommendation have fourteen days from service of this report and recommendation to file specific, written objections with the Clerk of Court.

Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in the report and recommendation within fourteen days following the date of its service, or on a date set by the district court, shall act to waive the party's right to review by the district court. Fed. R. Cr. P. 59(b)(2).

**THUS DONE AND SIGNED** in chambers at Lafayette, Louisiana this 31st day of March, 2017.

CAROL B. WHITEHURST
UNITED STATES MAGISTRATE JUDGE